Kent J. Schmidt (SBN 195969)
schmidt.kent@dorsey.com
DORSEY & WHITNEY LLP
600 Anton Boulevard, Suite 2000
Costa Mesa, CA 92626
Telephone: (714) 800-1400
Facsimile: (714) 800-1499

ANDREW HOLLY (to be admitted *pro hac vice*)
holly.andrew@dorsey.com
ALAN J. IVERSON (to be admitted *pro hac vice*)
iverson.alan@dorsey.com
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Infectolab Americas LLC, IGeneX, Inc., <br><br> Plaintiffs, <br><br> v. <br><br> ArminLabs GmbH, <br><br> Defendant. | Case No. _____ <br><br> **COMPLAINT FOR:** <br><br> (1) **LANHAM ACT VIOLATIONS** <br> (2) **UNFAIR COMPETITION;** <br> (3) **FALSE ADVERTISING;** <br> (4) **INTERNTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; AND** <br> (5) **NEGLIGENT INTERFERNECE WITH PROSPECTIVE ECONOMIC ADVANTAGE.** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Infectolab Americas LLC ("Infectolab") and IGeneX, Inc. ("IGeneX") hereby allege as follows:

## INTRODUCTION

1. Infectolab provides comprehensive lab testing for tick-borne infections and assists health care providers in diagnosing tick-borne diseases.

2. IGeneX provides comprehensive lab testing for tick-borne infections.

3. Defendant ArminLabs GmbH ("Defendant") is a German competitor of both Infectolab and IGeneX. It actively markets and distributes tick-borne blood test kits in the United States without certifications and approvals required by federal law.

4. Plaintiffs bring this Complaint for violations of federal and state law, and seek to enjoin Defendant from providing its services to U.S. citizens and residents in violation of federal and state laws and regulations. Plaintiffs also seek to enjoin Defendant's false advertising and misleading communications to U.S. consumers suggesting that it is selling its products in compliance with federal laws. Plaintiffs seek an appropriate award of damages (for Infectolab) and attorneys' fees (for both parties).

## THE PARTIES

5. Infectolab is a limited liability company organized and existing under the State of Delaware, with its principal place of business located at 3510 Hopkins Pl N, Oakdale, Minnesota 55128.

6. IGeneX is a corporation organized and existing under the laws of the State of California, with its principal place of business located in Milpitas, California 95035.

7. Upon information and belief, ArminLabs GmbH is a company organized and existing under the laws of Germany, with its principal place of business located at Zirbelstraße 58, 86154 Augsburg, Germany.

**JURISDICTION AND VENUE**

8. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 1121, and 28 U.S.C. § 1367(a).

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

10. This Court has personal jurisdiction over Defendant because, as set forth below, Defendant conducts business and is engaged in commerce within, and committed intentional torts and wrongful acts directed in, the State of California. Further, both Plaintiffs have been injured in their ability to provide their services to medical providers and patients in California including in this District.

**DEFENDANT'S HISTORY AND WRONGFUL CONDUCT**

**A.   BACKGROUND ON TICK-BORN DISEASE TESTING**

11. The phrase "tick-borne diseases" refers to a group of infectious diseases transmitted by bites from ticks. These infectious diseases represent a serious and growing danger to individuals in the United States. The most common tick-borne disease is Lyme disease, which likely infects hundreds of thousands of Americans every year. There are numerous other tick-borne illnesses found in the United States and through the world, including Rocky Mountain spotted fever, Colorado tick fever, and Crimean-Congo hemorrhagic fever. Tick-borne illness can have a devastating effect on infected individuals, causing physical pain and symptoms that in some instances can affect individuals for life.

12. Tick-borne infections are difficult to diagnose based exclusively on symptoms because those symptoms are similar to many other common conditions. Proper testing for tick-borne diseases is therefore critical to the prompt diagnosis and treatment of tick-borne diseases. Testing for tick-borne illness is generally done through blood tests that seek to identify various markers found in the blood of those with a particular tick-borne illness.

**B.   INFECTOLAB**

13. Infectolab GmbH (the parent company of Infectolab) was originally

founded in Germany by Dr. Carsten Nicolaus and Dr. Armin Schwarzbach. Beginning in April 2014, Infectolab GmbH received the right to be the exclusive United States distributor of various mobile tick-borne blood test kits developed by Autoimmun Diagnostika GmbH ("AID"), a German manufacturer.

14. The agreement also specified that use of AID's blood test kits was approved only for a partner laboratory of Infectolab GmbH that had been certified as compliant with the Clinical Laboratory Improvement Amendments ("CLIA"), which (as discussed in greater depth below) are regulations promulgated by the Centers for Medicare & Medicaid Services ("CMS"). These CLIA requirements ensure that labs offering tests in the United States meet certain quality standards. Any laboratory offering testing services to individuals in the United States is required to obtain CLIA certification prior to offering those services.

15. Dr. Schwarzbach left Infectolab GmbH. Upon his departure, he signed an agreement in which he agreed to give up any rights he had in Infectolab GmbH's right to the exclusive distributor of AID's blood test kits.

16. Dr. Nicolaus remained as the sole operator of Infectolab GmbH, which retained the right to be the exclusive distributor of AID's blood test kits. After Dr. Schwarzbach's departure, Infectolab GmbH continued to grow as a business. Its success in Germany led to its desire to expand into the United States market.

17. To expand into the United States market, Infectolab GmbH created Plaintiff Infectolab as a subsidiary to operate in the United States market. Infectolab spent several years taking the steps necessary to satisfy the regulatory requirements for conducting business in the United States. Most critically, Infectolab spent several years working to obtain CLIA certification, which it finally obtained in July of 2018. It also achieved the other necessary licenses and regulatory approval to operate legally in individual U.S. states as well.

18. AID has entered into an exclusive distribution agreement with Plaintiff Infectolab giving Plaintiff Infectolab the exclusive right to distribute AID's tick-

borne blood test kits in the United States.

### C. IGENEX

19. IGeneX is a competitor to both Infectolab and Defendant. It provides testing services for tick-borne diseases in the United States. Like Infectolab, IGeneX is CLIA compliant.

### D. DEFENDANT'S WRONGFUL CONDUCT

20. After Dr. Schwarzbach left Infectolab GmbH, he started Defendant as a competing laboratory in Augsburg, Germany.

21. Although neither Dr. Schwarzbach nor Defendant had the right to distribute AID's blood test kits in the United States, Defendant has engaged in an illegal scheme to distribute those test kits within the United States. It has done so despite the fact that it has brazenly failed to comply with CMS's CLIA compliance obligations. It is therefore selling products in the United States in willful violation of federal law.

#### 1. Defendant's Blood Test Kit Marketing in the United States

22. Defendant's scheme proceeds in several steps. First, Defendant employs a multi-pronged marketing approach to reach physicians and patients in the United States. Its website advertises diagnostic services for tick-borne illness to patients from "all over the world," including the United States. It offers blood testing for various tick-borne illnesses through the mobile test kits described above. Defendant further represents that it is accredited "internationally" and that "all" of its analytical techniques have been accredited.

23. In addition to its Internet presence, Defendant targets American physicians and patients and through trade publications and email solicitations. For example, below is a screenshot from the website *Lyme Advise*, an online directory dedicated to patients with Lyme's disease, which offers to ship a test kit "anywhere in the United States" for a $12.95 fee:

> **Armin Lab Test Kit**
>
> $12.95
>
> Order your ArminLabs test kit through Lyme Advise to receive 33% off all testing available from ArminLabs. This is for the test kit only. Which tests you order are up to you and/or your physician. The $12.95 Lyme Advise fee covers shipping costs to anywhere in the United States as well as our printing and packing expenses. To Learn More About Available Tests Visit
>
> https://www.arminlabs.com/en

24. After Defendant receives orders and payment from physicians or patients in the United States, it mails the test kits to them.

25. Those physicians and patients then use the test kits to draw blood samples and mail—usually by using UPS slips provided by Defendant—the test kits back to Defendant's laboratory in Augsburg, Germany for testing. Defendant then communicates the results of the tests back to the physicians and patients in the United States. Defendant's website outlines that process as follows:

> **How to ship your testkit to ArminLabs with UPS**
>
> Please contact us to order a testkit for the blooddraw.
> After you've received the testkit we recommend using the internet-based UPS platform www.ups.com to order a UPS pickup.
> If your testkit does not contain a UPS Shipment Waybill, please contact us some days before getting your blood drawn. In this case we will create your UPS Shipment Waybill and email it back, so that you can print it.

26. In addition to its online presence, Dr. Schwarzbach personally promotes Defendant's services at medical conferences across the United States. Defendant widely advertises its presence at those conferences, including on its Facebook page. At those conferences, Dr. Schwarzbach distributes blood test kits, as well as pre-paid UPS envelopes to physicians, who then mail completed test kits back to Defendant in Germany.

27. For example, Defendant presented at the International Lyme and Associated Disease Society conference Chicago, Illinois. That conference was held

1  at Chicago's Sheraton Hotel on or around November 1-4, 2018.  Below is a
2  photograph of Defendant's display booth at that conference:



28.     In addition to materials promoting the blood test kits, the table contains a stack of UPS envelopes.  Consistent with the scheme described above, the envelopes are self-addressed to Defendant's laboratory in Augsburg, Germany, as the below photograph depicts:



29.     In addition, the table contains an upright display of Defendant's Accreditation, which states that Defendant is accredited pursuant to DIN EN ISO 15189:2014 by German Accreditation Board DAkks.  A photograph of that Accreditation is below:



30. By representing to the public that it is "accredited," Defendant has held itself as doing its business in compliance with all laws and regulations and operating legally within the United States.

31. Defendant has directly targeted physicians and patients within the State of California. For example, Defendant offered a seminar at the Lyme Center of Chico, California on or around November 7, 2019. There, Defendant explained that it ships blood test kits to patients and provides paperwork to ship the test kits back to Defendant in Germany, including custom declarations and return envelopes from UPS, FedEx, or DHL. Below is a photograph of Defendant's presentation booth at that event:



32. Defendant's appearance at the Lyme Center of Chico, California is just one example of Defendant's targeting of California physicians and patients. Upon information and believe, Defendant has repeatedly advertised and distributed blood test kits to California physicians and patients. Upon information and belief, Defendant has also accepted and tested kits from those same California physicians and patients.

### 2. Defendant's Testing Violates Mandatory Federal CILA Certification Requirement

33. As noted above, Centers for Medicare and Medicaid (CMS) regulates all laboratory testing through the CLIA program. The objective of the CLIA program is to ensure quality laboratory testing. In total, CLIA covers approximately 260,000 laboratory entities.

34. CLIA is codified at 42 C.F.R. § 493 *et seq.*, which provides that "all" laboratories must be certified pursuant to the Clinical Laboratory Improvement Amendments ("CLIA"). *Id.* § 493.1. The regulation defines a "laboratory" as "a facility for the biological, microbiological, serological, chemical, immunohematological, hematological, biophysical, cytological, pathological, or other examination of materials derived from the human body for the purpose of providing information for the diagnosis, prevention, or treatment of any disease or impairment of, or the assessment of the health of, human beings." *Id.* § 493.2. Defendant is a "laboratory" within the meaning of 42 C.F.R. § 493.

35. The requirement that laboratories obtain CLIA certification applies to international laboratories such as Defendant. Guidance issued by CMS (which administers CLIA) states that "[f]or CLIA purposes, an international laboratory is a facility outside the U.S. or its territories that performs laboratory tests for the assessment of the health of human beings when such tests are referred by, and the results returned to, a facility or authorized person in the U.S. or its territories." *See* "International Laboratory CLIA Certification Process," Centers for Medicare and

Medicaid Services, *available at* https://www.cms.gov/Regulations-and-Guidance/Legislation/CLIA/Downloads/Internationallabwebpage.pdf (last accessed May 14, 2020).

36. CMS's guidance states that "any" testing of materials from human specimens collected in the United States and its territories is subject to CLIA regulations. *Id.* Accordingly, "[i]f specimens are transported outside of the United States and its territories for testing by international laboratories, then those laboratories are also subject to CLIA regulations." *Id.* Further, CMS provides that a laboratory must meet CLIA requirements if it performs "even one test." *See* "How to Apply for a CLIA Certificate, Including International Laboratories." Centers for Medicare and Medicaid Services, *available at* https://www.cms.gov/Regulations-and-Guidance/Legislation/CLIA/How_to_Apply_for_a_CLIA_Certificate_International_Laboratories (last accessed May 14, 2020).

37. On its website, Defendant represents that it is "accredited internationally" according to DIN EN ISO 15189:2014. *See* https://www.arminlabs.com/en/faq (last accessed May 14. 2020). Upon information and belief, however, Defendant does not have CLIA certification. Therefore, the tests that it is performing on United States patients' blood samples are unlawful and in violation of CMS's federal regulations.

38. Further, the manner in which Defendant performs its testing raises significant risks to the public. Among other things, and as noted above, Defendant requires that patients and physicians who use their services must send their blood sample back to Germany for testing. However, the antigen specific T-cells found in infected patients' blood, which tick-borne lab tests are designed to identify, are not stable at room temperature for longer than 48 hours. Upon information and belief, Defendant regularly performs tests for physicians and patients more than 48 hours after the blood sample was taken. This creates a significant risk of false lab test results, which lead to inaccurate diagnoses affecting patient outcomes.

### 3. Defendant's Scheme Violates Infectolab's Distribution Rights

39. As alleged above, Infectolab has the exclusive right to distribute AID's blood test kits in the United States. Further, Dr. Schwarzbach expressly released all rights to distribute those test kits when he separated from Infectolab GmbH.

40. With full knowledge of that relationship, Defendant has intentionally engaged in the above scheme to distribute AID's blood test kits throughout the United States.

41. Defendant's misconduct has interfered with Infectolab's distribution agreement with AID. Defendant has caused breach or disruption of that agreement and resulted in damages to Infectolab.

42. Defendant's misconduct has interfered with Infectolab's relationships with potential customers. By marketing to, and testing blood test kits from, United States patients, Defendant has unlawfully captured a share of the market that should belong to Infectolab.

## CAUSES OF ACTION

## COUNT I

**(Violation of the Lanham Act, 41 U.S.C. § 1125(a)(1), brought by Plaintiffs Infectolab and IGeneX)**

43. Plaintiffs incorporate by reference all paragraphs alleged above as if fully set forth herein.

44. As noted above, Defendant represents that it is certified by the German Accreditation Board DAkks, and that it has an "international accreditation no. DIN EN ISO 15189:2014." This representation is misleading insofar as its gives a reasonable lay consumer the impression that Defendant is "internationally" accredited and that it therefore has the right to perform lab testing services on residents of the United States.

COMPLAINT

4843-0322-3228\1

45. Further Defendant both directly markets its activities in the United States by appearing at conferences and by accepting orders from both physicians and patients in the United States. By doing so, both patients and physicians have the reasonable expectation that Defendant is fully compliant with U.S. laws, including the CLIA certification requirements established by CMS.

46. These representations are made in commercial advertising/promotions that are directed towards the citizen of California and the United States generally.

47. Plaintiffs have been, and will continue to be, injured in their business insofar as Defendant is receiving orders from patients and physicians in California for tick-borne testing services that would otherwise be directed to them.

## COUNT II

**(Violation of the Unfair Competition Law,**

**Cal. Bus. & Prof. Code §§ 17200, *et seq.*,**

**brought by Plaintiffs Infectolab and IGeneX)**

48. Plaintiffs incorporate by reference all paragraphs alleged above as if fully set forth herein.

49. The conduct referenced above, including Defendant's marketing, sale, and analysis of blood test kits, is an unlawful, unfair, and fraudulent business practice in violation of California Business & Professions Code § 17200, *et seq.*

50. California Business & Professions Code § 17200 provides: "As used in this chapter, unfair competition shall mean and include any unlawful or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising, and any act prohibited by Chapter 1 (commencing with section 17500) of Part 3 of Division 7 of the Business and Professions Code."

51. Defendant's scheme is unlawful. Defendant intended to market, sell, and analyze the blood test kits without the CLIA certification required by federal law. Defendant was and is unfairly enriched by this conduct. Defendant's practices were unfair and deceptive to Plaintiffs, which refrained from entering the blood test

kit marketplace until they received CLIA certification. In short, Defendant's decision to sell blood test kits without CLIA certification allowed it to unfairly compete against Plaintiffs.

52. The unfairness and fraudulent nature of Defendant's conduct is also underscored by its detrimental effect on consumers, who were fraudulently misled into believing that they were paying for blood test kits that complied with all applicable laws and requirements—when in fact this was not the case. Consumers reasonably expected that Defendant was performing its tests consistent with the various safeguards and protections that would be required in order to obtain CLIA certification. The harm to patients and citizens of California (and the United States at large) from Defendant's conduct is substantial and not outweighed by any countervailing benefits to consumers or society.

53. Defendant's conduct as alleged herein is also unlawful, in that it violates the following obligations imposed on it by 42 C.F.R. § 493 *et seq.*, which provides that "all" laboratories must be certified pursuant to the Clinical Laboratory Improvement Amendments ("CLIA"). *Id.* § 493.1. As alleged above, the requirement that laboratories obtain CLIA certification applies to international laboratories such as Defendant.

54. Defendant's conduct has unlawfully violated the above requirements as Defendant, through use of the mobile blood test kits, has tested blood that was collected from patients in the United States and transported to its laboratory in Germany. Defendant has then returned the results of those tests back to patients in the United States. Defendant has engaged in that conduct despite not having the required CLIA certification. That misconduct amounts to an unfair and unlawful business practice as defined by Cal. Bus. & Prof. Code §§ 17200 *et seq.*

55. Pursuant to Cal. Bus. & Prof. Code §§ 17200 *et seq.*, Plaintiffs are entitled to a permanent injunction requiring Defendant to refrain from engaging in the unlawful and unfair business practices alleged herein and a declaration as to the

validity of Plaintiffs' claims, as well as an injunction precluding Defendant from marketing and selling its services in the United States in violation of federal law. Further, they are entitled to damages in an amount to be proven at trial.

## COUNT III

### (Violation of the False Advertising Law,
### Cal. Bus. & Prof. Code §§ 17500, *et seq.*,
### brought by Plaintiffs Infectolab and IGeneX)

56.  Plaintiffs incorporate by reference all paragraphs alleged above as if fully set forth herein.

57.  The conduct alleged above also constitutes false advertising in violation of Cal. Cal. Bus. & Prof. Code §§ 17500 *et seq.*  That statute provides that: "It is unlawful for any . . . corporation . . . to make or disseminate or cause to be made or disseminated before the public in this state, … in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Cal. Bus. & Prof. Code § 17500.

58.  As discussed above, Defendant's advertising gives the misleading impression that its blood test kits are approved for distribution and sale in the United States when in fact Defendant lacked such approval.

59.  Defendant's advertisements were untrue or misleading.  Defendant misled patients by making misleading statements and failing to disclose that it lacked CLIA certification.

60.  Defendant knew or should have known that those statements were likely to deceive members of the public.

61.  Pursuant to Cal. Bus. & Prof. Code §§ 17500 *et seq.*, Plaintiffs are entitled to a permanent injunction requiring Defendant to refrain from engaging in

the false advertising practices alleged herein and a declaration as to the validity of Plaintiffs' claims, as well as a declaration that Defendant's representations regarding the blood test kits constitutes false advertising. Further, they are entitled to damages in an amount to be proven at trial.

## COUNT IV

**(Intentional Interference with Prospective Economic Advantage, brought by Plaintiff Infectolab)**

62. Infectolab incorporates by reference all paragraphs alleged above as if fully set forth herein.

63. Infectolab has an existing and prospective business relationship with AID, the manufacturer of the blood test kits.

64. Infectolab has a prospective business advantage flowing from its agreement with AID to be the exclusive distributor of blood test kids in the United States.

65. Defendant's practice of marketing and distribution the blood test kits in the United States constitutes an injurious interference with Infectolab's prospective business advantage.

66. That conduct is independently wrongful, as Defendant lacked the right to distribute in the United States and, separately, operated in the United States without the required CLIA certification, as alleged above.

67. Defendant knew of Infectolab's exclusive distribution rights and, by marketing and distributing in the United States, intended to interfere with Infectolab's prospective business advantage.

68. That misconduct caused Infectolab to suffer damages in an amount to be determined at trial.

# COUNT V

## (Negligent Interference with Prospective Economic Advantage, brought by Plaintiff Infectolab)

69. Infectolab incorporates by reference all paragraphs alleged above as if fully set forth herein.

70. Infectolab has an existing and prospective business relationship with AID, the manufacturer of the blood test kits.

71. Infectolab has a prospective business advantage flowing from its agreement with AID to be the exclusive distributor of blood test kids in the United States.

72. Defendant's practice of marketing and distribution the blood test kits in the United States constitutes an injurious interference with Infectolab's prospective business advantage.

73. That conduct is independently wrongful, as Defendant lacked the right to distribute in the United States and, separately, operated in the United States without the required CLIA certification, as alleged above.

74. Defendant owed a duty of care to Infectolab not to interfere with its prospective economic advantage flowing from Infectolab's relationship with AID.

75. Defendant's misconduct breached that duty of care.

76. That misconduct caused Infectolab to suffer damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A. Award injunctive and equitable relief as necessary to stop Defendant's pattern of unlawful and unfair conduct;

B. Award damages in an amount to be proven at trial, including direct and consequential damages plus applicable interest and costs;

C. Award all attorneys' fees and costs in bringing this action, to the extent

1  recoverable by law;

2      D.    Award punitive and exemplary damages in an amount sufficient to
3  punish and deter Defendant from continuing its willful and outrageous misconduct;
4  and

5      E.    Issue any such other relief as the Court deems appropriate, just, and
6  proper.

7  Dated:  May 15, 2020                               DORSEY & WHITNEY LLP

By: */s/ Kent J. Schmidt*
    Kent J. Schmidt
    Andrew Holly (to be admitted *pro hac vice*)
    Alan J. Iverson (to be admitted *pro hac vice*)

Attorneys for Plaintiffs