KENT J. SCHMIDT (SBN 195969)
schmidt.kent@dorsey.com
DORSEY & WHITNEY LLP
600 Anton Boulevard, Suite 2000
Costa Mesa, CA 92626
Telephone:  (714) 800-1400
Facsimile:  (714) 800-1499

ANDREW HOLLY (admitted *pro hac vice*)
holly.andrew@dorsey.com
ALAN J. IVERSON (admitted *pro hac vice*)
iverson.alan@dorsey.com
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Infectolab Americas LLC, IGeneX, Inc., <br><br> Plaintiffs, <br><br> v. <br><br> ArminLabs GmbH, <br><br> Defendant. | Case No. 20-cv-03318-VKD___ <br><br> **PLAINTIFFS' FIRST AMENDED COMPLAINT FOR:** <br><br> **(1) LANHAM ACT VIOLATIONS;** <br> **(2) UNFAIR COMPETITION;** <br> **(3) FALSE ADVERTISING;** <br> **(4) INTERNTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;** <br> **(5) NEGLIGENT INTERFERNECE WITH PROSPECTIVE ECONOMIC ADVANTAGE; AND** <br> **(6) TORTIOUS INTERFERENCE WITH CONTRACT.** <br><br> **DEMAND FOR JURY TRIAL** |

PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs Infectolab Americas LLC ("Infectolab") and IGeneX, Inc. ("IGeneX") hereby allege as follows:

**INTRODUCTION**

1.     Infectolab provides comprehensive lab testing for tick-borne infections and assists health care providers in diagnosing tick-borne diseases.

2.     IGeneX provides comprehensive lab testing for tick-borne infections.

3.     Defendant ArminLabs GmbH ("Defendant") is a German competitor of both Infectolab and IGeneX.  It actively markets itself as a laboratory specializing in "diagnosing tick-borne diseases."  It distributes blood test kits in the United States, which customers use to draw blood, and Defendant then purports to use reagents and antigens to test these blood samples for tick-borne diseases.  It does so without the certifications and approvals required by United States law.

4.     Plaintiffs bring this Complaint for violations of federal and state law, and seek to enjoin Defendant from providing its services to U.S. citizens and residents in violation of federal and state laws and regulations.  Plaintiffs also seek to enjoin Defendant's false advertising and misleading communications to U.S. consumers suggesting that it is selling its services in compliance with federal laws. Plaintiffs seek an appropriate award of damages (for Infectolab) and attorneys' fees (for both parties).

**THE PARTIES**

5.     Infectolab is a limited liability company organized and existing under the State of Delaware, with its principal place of business located at 3510 Hopkins Pl N, Oakdale, Minnesota 55128.

6.     IGeneX is a corporation organized and existing under the laws of the State of California, with its principal place of business located in Milpitas, California 95035.

7.     Upon information and belief, ArminLabs GmbH is a company organized and existing under the laws of Germany, with its principal place of

1  business located at Zirbelstraße 58, 86154 Augsburg, Germany.

2  **JURISDICTION AND VENUE**

3  8.  This Court has subject matter jurisdiction over this case pursuant to 28

4  U.S.C. § 1331, 15 U.S.C. § 1121, and 28 U.S.C. § 1367(a).

5  9.  Venue is proper in this district pursuant to 28 U.S.C. § 1391.

6  10.  This Court has personal jurisdiction over Defendant because, as set

7  forth below, Defendant conducts business and is engaged in commerce within, and

8  committed intentional torts and wrongful acts directed in, the State of California.

9  Further, both Plaintiffs have been injured in their ability to provide their services to

10  medical providers and patients in California including in this District.

11  **DEFENDANT'S HISTORY AND WRONGFUL CONDUCT**

12  **A.  BACKGROUND ON TICK-BORNE DISEASE TESTING**

13  11.  The phrase "tick-borne diseases" refers to a group of infectious

14  diseases transmitted by bites from ticks.  These infectious diseases represent a

15  serious and growing danger to individuals in the United States.  The most common

16  tick-borne disease is Lyme disease, which likely infects hundreds of thousands of

17  Americans every year.  There are numerous other tick-borne illnesses found in the

18  United States and through the world, including Rocky Mountain spotted fever,

19  Colorado tick fever, and Crimean-Congo hemorrhagic fever.  Tick-borne illness can

20  have a devastating effect on infected individuals, causing physical pain and

21  symptoms that in some instances can affect individuals for life.

22  12.  Tick-borne infections are difficult to diagnose based exclusively on

23  symptoms because those symptoms are similar to many other common conditions.

24  Proper testing for tick-borne diseases is therefore critical to the prompt diagnosis

25  and treatment of tick-borne diseases.  Testing for tick-borne illness is generally

26  done by testing blood with antigens and reagents that seek to identify various

27  markers found in the blood of those with a particular tick-borne illness.

28

PLAINTIFFS' FIRST AMENDED COMPLAINT

**B.  INFECTOLAB**

13.    Infectolab GmbH (the parent company of Infectolab) was originally founded in Germany by Dr. Carsten Nicolaus.  Prior to incorporation of Infecetolab GmbH, the Laboratory of the BCA-Clinic GmbH operated under the name of Infectolab. Infectolab has for years had the right to be the exclusive United States partner for various antigens and reagents  (the "Products") used to diagnose tick-borne diseases developed by Autoimmun Diagnostika GmbH ("AID"), a German manufacturer.  These Products are used to test blood samples to determine whether an individual has a tick-borne illness.  This understanding was reaffirmed in an agreement dated February 26, 2020, a true and correct copy of which is attached as **Exhibit A** to this Complaint.  This agreement precludes the sale of the Products to any other third party who will "directly or indirectly" use the Products to serve customers in the United States.

14.    The agreement specifies that use of the Products is conditioned upon (among other things) compliance with U.S. federal regulations called Clinical Laboratory Improvement Amendments ("CLIA").  As discussed in greater depth below, these regulations promulgated by the Centers for Medicare & Medicaid Services ("CMS").  These CLIA requirements ensure that labs offering tests in the United States meet certain quality standards.  Any laboratory offering testing services to individuals in the United States is required to obtain CLIA certification prior to offering those services.

15.    Infectolab GmbH operates in the United States market through its subsidiary Plaintiff Infectolab.  Prior to selling in the U.S. Market, Infectolab spent several years taking the steps necessary to satisfy the regulatory requirements for conducting business in the United States.  Most critically, Infectolab spent several years working to obtain CLIA certification, which it finally obtained in July of 2018.  It also obtained the other necessary licenses and regulatory approval to operate legally in individual U.S. states as well.

16.     As noted above, AID has entered into an exclusive partnership agreement with Plaintiff Infectolab, making Plaintiff Infectolab its exclusive partner to use the Products in the United States.

**C.     IGENEX**

17.     IGeneX is a competitor to both Infectolab and Defendant.  It provides testing services for tick-borne diseases in the United States.  Like Infectolab, IGeneX is CLIA compliant.

**D.     DEFENDANT'S WRONGFUL CONDUCT**

18.     After working with Dr. Carsten Nicolaus, Dr. Schwarzbach started Defendant as a competitor in Augsburg, Germany.

19.     Although neither Dr. Schwarzbach nor Defendant has the right to use the Products "directly or indirectly" to serve the United States, Defendant has engaged in an illegal scheme to service customers in the United States with the Products.  It has done so despite the fact that it has brazenly failed to comply with CMS's CLIA compliance obligations.  It is therefore selling services and products in the United States in willful violation of federal law.

**1.     Defendant's Marketing in the United States**

20.     Defendant's scheme proceeds in several steps.  First, Defendant employs a multi-pronged marketing approach to reach physicians and patients in the United States.  Its website advertises diagnostic services for tick-borne illness to patients from "all over the world," including the United States.  Defendant represents that it is accredited "internationally" and that "all" of its analytical techniques have been accredited.

21.     In addition to its Internet presence, Defendant targets American physicians and patients and through trade publications and email solicitations.  For example, below is a screenshot from the website *Lyme Advise*, an online directory dedicated to patients with Lyme's disease, which offers to ship a blood test kit "anywhere in the United States" for a $12.95 fee:



22.     After Defendant receives orders and payment from physicians or patients in the United States, it mails the blood test kits to them.

23.     Those physicians and patients then use the test kits to draw blood samples and mail the blood drawn back to Defendant's laboratory in Augsburg, Germany for testing.  Defendant uses the Products to test the blood for various tick-borne illnesses.  Defendant then communicates the results of the tests back to the physicians and patients in the United States.  Defendant's website outlines that process as follows:

> ### How to ship your testkit to ArminLabs with UPS
>
> Please contact us to order a testkit for the blooddraw.
> After you've received the testkit we recommend using the internet-based UPS platform www.ups.com to order a UPS pickup.
> If your testkit does not contain a UPS Shipment Waybill, please contact us some days before getting your blood drawn. In this case we will create your UPS Shipment Waybill and email it back, so that you can print it.

24.     In addition to its online presence, Dr. Schwarzbach personally promotes Defendant's services at medical conferences across the United States. Defendant widely advertises its presence at those conferences, including on its Facebook page.  At those conferences, Dr. Schwarzbach distributes blood test kits, who then mail completed test kits back to Defendant in Germany as generally described above.

25.     For example, Defendant presented at the International Lyme and

1   Associated Disease Society conference Chicago, Illinois.  That conference was held

2   at Chicago's Sheraton Hotel on or around November 1-4, 2018.  Below is a

3   photograph of Defendant's display booth at that conference:



4
5
6
7
8
9
10
11
12

13   26.   In addition to materials promoting the blood test kits, the table

14   contains a stack of UPS envelopes.  Consistent with the scheme described above,

15   the envelopes are self-addressed to Defendant's laboratory in Augsburg, Germany,

16   as the below photograph depicts:



17
18
19
20
21
22
23
24
25

26   27.   In addition, the table contains an upright display of Defendant's

27   Accreditation, which states that Defendant is accredited pursuant to DIN EN ISO

28   15189:2014 by German Accreditation Board DAkks.  A photograph of that

Accreditation is below:



28.    By representing to the public that it is "accredited," and by directing marketing to the United States generally, Defendant has implicitly represented that it is doing its business in compliance with all laws and regulations and operating legally within the United States.

29.    Defendant has directly targeted physicians and patients within the State of California.  For example, Defendant offered a seminar at the Lyme Center of Chico, California on or around November 7, 2019.  There, Defendant explained that it ships blood test kits to patients and provides paperwork to ship the test kits back to Defendant in Germany, including custom declarations and return envelopes from UPS, FedEx, or DHL.  Below is a photograph of Defendant's presentation booth at that event:



1    30.    Defendant's appearance at the Lyme Center of Chico, California is just

2    one example of Defendant's targeting of California physicians and patients.  Upon

3    information and belief, Defendant has repeatedly advertised and distributed blood

4    test kits to California physicians and patients.  Upon information and belief,

5    Defendant has also accepted and tested kits from those same California physicians

6    and patients.

7               **2.    Defendant's Testing Violates Mandatory Federal CILA**

8                       **Certification Requirement**

9    33.    As noted above, Centers for Medicare and Medicaid (CMS) regulates

10   all laboratory testing through the CLIA program.  The objective of the CLIA

11   program is to ensure quality laboratory testing.  In total, CLIA covers

12   approximately 260,000 laboratory entities.

13   34.    CLIA is codified at 42 C.F.R. § 493 *et seq.*, which provides that "all"

14   laboratories must be certified pursuant to the Clinical Laboratory Improvement

15   Amendments ("CLIA").  *Id.* § 493.1.  The regulation defines a "laboratory" as "a

16   facility for the biological, microbiological, serological, chemical,

17   immunohematological, hematological, biophysical, cytological, pathological, or

18   other examination of materials derived from the human body for the purpose of

19   providing information for the diagnosis, prevention, or treatment of any disease or

20   impairment of, or the assessment of the health of, human beings."  *Id.* § 493.2.

21   Defendant is a "laboratory" within the meaning of 42 C.F.R. § 493.

22   35.    The requirement that laboratories obtain CLIA certification applies to

23   international laboratories such as Defendant.  Guidance issued by CMS (which

24   administers CLIA) states that "[f]or CLIA purposes, an international laboratory is a

25   facility outside the U.S. or its territories that performs laboratory tests for the

26   assessment of the health of human beings when such tests are referred by, and the

27   results returned to, a facility or authorized person in the U.S. or its territories."  *See*

28   "International Laboratory CLIA Certification Process," Centers for Medicare and

Medicaid Services, *available at* https://www.cms.gov/Regulations-and-Guidance/Legislation/CLIA/Downloads/Internationallabwebpage.pdf (last accessed October 16, 2020).

36.     CMS's guidance states that "any" testing of materials from human specimens collected in the United States and its territories is subject to CLIA regulations. *Id.* Accordingly, "[i]f specimens are transported outside of the United States and its territories for testing by international laboratories, then those laboratories are also subject to CLIA regulations." *Id.* Further, CMS provides that a laboratory must meet CLIA requirements if it performs "even one test." *See* "How to Apply for a CLIA Certificate, Including International Laboratories." Centers for Medicare and Medicaid Services, *available at* https://www.cms.gov/Regulations-and-Guidance/Legislation/CLIA/How_to_Apply_for_a_CLIA_Certificate_International_Laboratories (last accessed October 16, 2020).

37.     On its website, Defendant represents that it is "accredited internationally" according to DIN EN ISO 15189:2014. *See* https://www.arminlabs.com/en/faq (last accessed October 16. 2020). Upon information and belief, however, Defendant does not have CLIA certification. Therefore, the tests that it is performing on United States patients' blood samples are unlawful and in violation of CMS's federal regulations.

38.     Further, the manner in which Defendant performs its testing raises significant risks to the public. Among other things, and as noted above, Defendant requires that patients and physicians who use their services must send their blood sample back to Germany for testing. However, the antigen specific T-cells found in infected patients' blood, which tick-borne lab tests are designed to identify, are not stable at room temperature for longer than 48 hours. Upon information and belief, Defendant regularly performs tests for physicians and patients more than 48 hours after the blood sample was taken. This creates a significant risk of false lab test results, which lead to inaccurate diagnoses affecting patient outcomes.

39.     Defendant's misconduct has damaged Plaintiffs Infectolab and IGeneX because it has allowed Defendant unfairly to capture a share of the market that should rightfully belong to Plaintiffs.  Upon information and belief, consumers chose to purchase Defendant's services because they believed that Defendant was operating in compliance with all applicable laws and regulations, including CLIA requirements.  Upon information and belief, at least some of those consumers would not have purchased Defendant's services, and would have instead purchased services from Plaintiffs Infectolab and IGeneX, but for Defendant's misconduct.

### 3.     Defendant's Scheme Violates Infectolab's Contractual Rights

40.      As alleged above, Infectolab is the exclusive partner for the Products for use directly or indirectly in the United States.

41.     With full knowledge of that relationship, Defendant has intentionally engaged in the above scheme to use the Products to serve customers in the United States.

42.     Defendant's misconduct has interfered with Infectolab's agreement with AID.  Defendant has caused breach or disruption of that agreement and resulted in damages to Infectolab.

43.     Defendant's misconduct has interfered with Infectolab's relationships with potential customers.  By marketing to, and testing samples from United States residents using the Products, Defendant has unlawfully captured a share of the market that should belong to Infectolab.

## CAUSES OF ACTION

## COUNT I

**(Violation of the Lanham Act, 41 U.S.C. § 1125(a)(1),**

**brought by Plaintiffs Infectolab and IGeneX)**

44.     Plaintiffs incorporate by reference all paragraphs alleged above as if fully set forth herein.

45.     As noted above, Defendant represents that it is certified by the German Accreditation Board DAkks, and that it has an "international accreditation no. DIN EN ISO 15189:2014." This representation is misleading insofar as its gives a reasonable lay consumer the impression that Defendant is "internationally" accredited and that it therefore has the right to perform lab testing services on residents of the United States.

46.     Further Defendant both directly markets its activities in the United States by appearing at conferences and by accepting orders from both physicians and patients in the United States. By doing so, both patients and physicians have the reasonable expectation that Defendant is fully compliant with U.S. laws, including the CLIA certification requirements established by CMS.

47.     These representations are made in commercial advertising/promotions that are directed towards the citizen of California and the United States generally.

48.     Plaintiffs have been, and will continue to be, injured in their business insofar as Defendant is receiving orders from patients and physicians in California for tick-borne testing services that would otherwise be directed to them.

## COUNT II

### (Violation of the Unfair Competition Law,
### Cal. Bus. & Prof. Code  §§ 17200, *et seq.*,
### brought by Plaintiffs Infectolab and IGeneX)

49.     Plaintiffs incorporate by reference all paragraphs alleged above as if fully set forth herein.

50.     The conduct referenced above, including Defendant's marketing, sale, and performance of its services on United States residents is an unlawful, unfair, and fraudulent business practice in violation of California Business & Professions Code § 17200, *et seq.*

51.     California Business & Professions Code § 17200 provides: "As used in this chapter, unfair competition shall mean and include any unlawful or fraudulent

business act or practice and unfair, deceptive, untrue or misleading advertising, and any act prohibited by Chapter 1 (commencing with section 17500) of Part 3 of Division 7 of the Business and Professions Code."

52.     Defendant's scheme is unlawful.  Defendant intended to market, sell, and perform its services to and for residents of the United States without the CLIA certification required by federal law.  Defendant was and is unfairly enriched by this conduct.  Defendant's practices were unfair and deceptive to Plaintiffs, which refrained from entering the laboratory test marketplace until they received CLIA certification, and upon information and belief have lost sales to residents of the United States who have relied upon Defendant's advertising and have chosen to use Defendant's services rather than Plaintiffs'.  In short, Defendant's decision to market and sell its testing services to United States residents without CLIA certification has allowed it to unfairly compete against Plaintiffs.

53.     The unfairness and fraudulent nature of Defendant's conduct is also underscored by its detrimental effect on consumers, who were fraudulently misled into believing that they were paying for testing services that complied with all applicable laws and requirements—when in fact this was not the case.  Consumers reasonably expected that Defendant was performing its services consistent with the various safeguards and protections that would be required in order to obtain CLIA certification, and in fact with a CLIA certification. The harm to patients and citizens of California (and the United States at large) from Defendant's conduct is substantial and not outweighed by any countervailing benefits to consumers or society.

54.     Defendant's conduct as alleged herein is also unlawful, in that it violates the following obligations imposed on it by 42 C.F.R. § 493 *et seq.*, which provides that "all" laboratories must be certified pursuant to the Clinical Laboratory Improvement Amendments ("CLIA").  *Id.* § 493.1.  As alleged above, the requirement that laboratories obtain CLIA certification applies to international

laboratories such as Defendant who provide services to residents of the United States.

55.    Defendant's conduct has unlawfully violated the above requirements as Defendant has provided laboratory testing services to United States residents without the required CLIA certification.  That misconduct amounts to an unfair and unlawful business practice as defined by Cal. Bus. & Prof. Code §§ 17200 *et seq.*

56.    Pursuant to Cal. Bus. & Prof. Code §§ 17200 *et seq.*, Plaintiffs are entitled to a permanent injunction requiring Defendant to refrain from engaging in the unlawful and unfair business practices alleged herein and a declaration as to the validity of Plaintiffs' claims, as well as an injunction precluding Defendant from marketing and selling its services in the United States in violation of federal law. Further, they are entitled to damages and attorneys' fees in an amount to be proven at trial.

## COUNT III

**(Violation of the False Advertising Law,**

**Cal. Bus. & Prof. Code  §§ 17500, *et seq.*,**

**brought by Plaintiffs Infectolab and IGeneX)**

57.    Plaintiffs incorporate by reference all paragraphs alleged above as if fully set forth herein.

58.    The conduct alleged above also constitutes false advertising in violation of Cal. Cal. Bus. & Prof. Code §§ 17500 *et seq.*  That statute provides that: "It is unlawful for any  . . . corporation . . . to make or disseminate or cause to be made or disseminated before the public in this state, … in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."  Cal. Cal. Bus. & Prof. Code § 17500.

59.     As discussed above, Defendant's advertising gives the misleading impression that its testing services are approved for use by United States residents when in fact Defendant lacked such approval.

60.     Defendant's advertisements were untrue or misleading.  Defendant misled patients by making misleading statements and failing to disclose that it lacked CLIA certification.

61.     Defendant knew or should have known that those statements were likely to deceive members of the public.

62.     Pursuant to Cal. Bus. & Prof. Code §§ 17500 *et seq.*, Plaintiffs are entitled to a permanent injunction requiring Defendant to refrain from engaging in the false advertising practices alleged herein and a declaration as to the validity of Plaintiffs' claims, as well as a declaration that Defendant's representations regarding the blood test kits constitutes false advertising.  Further, they are entitled to damages in an amount to be proven at trial.

## COUNT IV

**(Intentional Interference with Prospective Economic Advantage, brought by Plaintiff Infectolab)**

63.     Infectolab incorporates by reference all paragraphs alleged above as if fully set forth herein.

64.     Infectolab has an existing and prospective business relationship with AID, the manufacturer of the Products.

65.     Infectolab has a prospective business advantage flowing from its agreement with AID to be the exclusive partner for the Products in the United States.

66.     Defendant's practice of marketing and selling its services (and using the Products to do so) in the United States constitutes an injurious interference with Infectolab's prospective business advantage.

67.     That conduct is independently wrongful, as Defendant lacked the right

to use the Products to serve residents of the United States and, separately, provided its services in the United States without the required CLIA certification, as alleged above.

68.     Defendant knew of Infectolab's contractual rights and, by using the Products in connection with its services to residents of the United States, intended to interfere with Infectolab's prospective business advantage.

69.     That misconduct caused Infectolab to suffer damages in an amount to be determined at trial.

### **COUNT V**

**(Negligent Interference with Prospective Economic Advantage, brought by Plaintiff Infectolab)**

70.     Infectolab incorporates by reference all paragraphs alleged above as if fully set forth herein.

71.     Infectolab has an existing and prospective business relationship with AID, the manufacturer of the Products.

72.     Infectolab has a prospective business advantage flowing from its agreement with AID to be AID's exclusive partner with respect to the Products in the United States.

73.     Defendant's practice of marketing and selling its services to residents of the United States (including by using the Products) constitutes an injurious interference with Infectolab's prospective business advantage.

74.     That conduct is independently wrongful, as Defendant lacked the right to provide services to United States residents because it lacked the required CLIA certification, as alleged above.

75.     Defendant owed a duty of care to Infectolab not to interfere with its prospective economic advantage flowing from Infectolab's relationship with AID.

76.     Defendant's misconduct breached that duty of care.

77.     That misconduct caused Infectolab to suffer damages in an amount to

1  be determined at trial.

2  **COUNT VI**

3  **(Tortious Interference with Contract,**

4  **Brought by Plaintiff Infectolab)**

5  78.  Infectolab incorporates by reference all paragraphs alleged above as if

6  fully set forth herein.

7  79.  A valid contract exists between Infectolab and AID as referenced

8  herein and attached as **Exhibit A**.  Under the terms of that contract, Infectolab has

9  the right to be the exclusive partner and sole user of the Products in connection with

10  services to residents in the United States market.  The contract precludes the sale of

11  the Products to other parties who "directly or indirectly" use the Products to

12  provide services to the United States market.

13  80.   Defendant, by virtue of its prior dealings with Infectolab and status as

14  a competitor in the industry, has knowledge of Infecto's contractual relationship

15  with AID.

16  81.  Defendant's practice of marketing and selling its services (and using

17  the Products to do so) in the United States is designed to induce a breach or

18  disruption of Infectolab's contractual relationship.

19  82.  Defendant's misconduct has resulted in a breach or disruption of

20  Infectolab's contractual relationship and has interfered with Infectolab's right to be

21  the exclusive partner and user of the Products in connection with services provided

22  to the United States market.

23  83.  That conduct is independently wrongful, as Defendant lacked the right

24  to provide services to United States residents because it lacked the required CLIA

25  certification, as alleged above.

26  84.  That misconduct caused Infectolab to suffer damages in an amount to

27  be determined at trial.

28

PLAINTIFFS' FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.     Award injunctive and equitable relief as necessary to stop Defendant's pattern of unlawful and unfair conduct;

B.     Award damages in an amount to be proven at trial, including direct and consequential damages plus applicable interest and costs;

C.     Award all attorneys' fees and costs in bringing this action, to the extent recoverable by law;

D.     Award punitive and exemplary damages in an amount sufficient to punish and deter Defendant from continuing its willful and outrageous misconduct; and

E.     Issue any such other relief as the Court deems appropriate, just, and proper.

Dated:  October 16, 2020                    DORSEY & WHITNEY LLP


                                           By:  */s/ Andrew Holly*
                                                Kent J. Schmidt
                                                Andrew Holly (Admitted *pro hac vice*)
                                                Alan J. Iverson (Admitted *pro hac vice*)

                                                *Attorneys for Plaintiffs*

PLAINTIFFS' FIRST AMENDED COMPLAINT