# EXHIBIT A

## EXCLUSIVE SUPPLY AGREEMENT

This **EXCLUSIVE SUPPLY AGREEMENT** (the "Agreement") is made as of the 26th day of February 2020, (the "Effective Date") by and between Infectolab Americas LLC (hereinafter called "Customer"), and AID GmbH, having a principal business address at Strassberg, Germany (hereinafter called "Manufacturer", AID GmbH is exclusive distributor of the manufacturer GenID GmbH and in this agreement called manufacturer). Manufacturer and Customer are referred to herein individually as a "Party" and collectively as the "Parties").

WITNESSETH:

**WHEREAS**, Manufacturer is engaged in the commercialization of certain medical products;

**WHEREAS**, Customer is engaged in using manufacturers products in his CLIA lab

**WHEREAS**, Manufacturer desires to appoint customer as its exclusive partner of the Product in the Territory (as such terms are defined below) and customer desires to accept such appointment subject to the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreement herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1. **DEFINITIONS**

In addition to terms defined within the Agreement, the following terms have the meaning ascribed thereto within this Agreement.

1.01 "Confidential Information" means any and all information of or about a Party including all information relating to any technology, product, process or intellectual property of such party (including, but not limited to, owned or licensed intellectual property rights, data, know-how, samples, technical and non-technical materials, and specifications), the terms and conditions of this Agreement, the existence of this Agreement as well as any business plan, financial information, or other confidential commercial information. Notwithstanding the foregoing, specific information shall not be considered "Confidential Information" with respect to such Party to the extent that the other Party possessing such information can demonstrate by written record or other suitable physical evidence that:

(a) such specific information was lawfully in such other Party's possession or control prior to the time such information was disclosed to such other Party by the Party to whom the information relates;

(b) such specific information was developed by such other Party without such Party having access to the Confidential Information;

(c) such specific information was lawfully obtained by such other Party from a third party under no obligation of confidentiality to the Party to whom such information relates; or

(d) such specific information was at the time it was disclosed or obtained by such other Party, or thereafter became, publicly known otherwise than through a breach by such other Party of such other Party's obligations to the Party to whom such information relates.

1.02   "FDA" means the United States Food and Drug Administration.

1.03   "Field" means any and all indications for which the FDA has approved customer for using in a CLIA lab .

1.04   "Governmental Authority" means any applicable national, state, municipal, local, territorial or other governmental department, agency, regulatory authority, court, or judicial or administrative body.

1.05   "Initial Term" has the meaning set forth in Section 6.01.

1.06   "Intellectual Property" means all of the following: (i) patent applications, continuation applications, continuation-in-part applications, divisional applications, and United States patents corresponding to any of the foregoing that may grant or may have been granted on any of the foregoing, including reissues, re-examinations and extensions and any supplemental protection certificates, or the like; (ii) all know-how, work product, trade secrets, inventions (whether patentable or otherwise), data, processes, techniques, procedures, compositions, devices, methods, formulas, protocols and information, whether patentable or not; (iii) copyrightable works, copyrights and applications, registrations and renewals; (iv) logos, trademarks, service marks, and all applications and registrations relating thereto; (v) other proprietary rights; and (vi) copies and tangible embodiments of any one or more of the foregoing.

1.07   "Law" or "Laws" means any applicable declaration, decree, directive, legislative enactment, order, ordinance, regulation, rule or other binding restriction of or by any Governmental Authority, as amended from time to time.

1.08   "Manufacturer IP" means all Intellectual Property rights owned or licensed by Manufacturer which are necessary or useful to use the Product within the Field in the Territory.

1.09   "Person" means an individual, sole proprietorship, partnership, limited partnership, limited liability partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture or other similar entity or organization, including a Governmental Authority.

1.10   "Products" means the products that are described on Schedule A attached hereto.

1.11   "Regulatory Approval" means, with respect to the Territory, any and all approvals or premarket notifications necessary to use the Product in the Territory.

1.12 "Renewal Term" has the meaning set forth in Section 6.01.

1.13 "Term" has the meaning set forth in Section 6.01.

1.14 "Territory" means the states and territories of the United States of America.

2. **APPOINTMENT OF INFECTOLAB AS EXCLUSIVE CUSTOMER**

2.01 Relationship. Subject to the terms and conditions of this Agreement, Manufacturer hereby appoints Customer as its exclusive customer of the Products in the Territory during the Term, and Customer hereby accepts such appointment (hereinafter the Subject to the terms and conditions of this Agreement, Customer shall have the sole right to use the Products in the Territory, and Manufacturer may not sell the Products to any third party, directly or indirectly. Except, Manufacturer can sell Products to other third parties exclusively for research studies and FDA approval studies.

2.02 Additional Products. If during the Term Manufacturer introduces any new Antigens, Manufacturer shall notify Infectolab Americas. Customer may elect to commence good faith negotiations with the Manufacturer regarding the addition to this Agreement of such product(s) and the terms and conditions relating thereto, including without limitation the applicable transfer prices. If the Parties agree in principle to such terms and conditions, the Parties will add the product(s) and the terms and conditions relating thereto to this Agreement by executing an amended Schedule A to this Agreement describing the same and upon execution of such amendment, each of the product(s) in question shall become a "Product" for the purposes of this Agreement.

3. **PRODUCT TRANSFER PRICING**

3.01 Initial Transfer Price. The transfer price to be paid to Manufacturer for each Product is included in Schedule A or as otherwise negotiated between the Parties.

3.02 Payment Terms. All payments due to Manufacturer hereunder shall be made in Euro no later than thirty (30) days after receipt of an invoice from Manufacturer. Payment shall be made by wire transfer, check or other instrument approved by Manufacturer in accordance with reasonable instructions provided by Manufacturer. Amounts not paid by Customer within thirty (30) days after receipt of the invoice therefor shall accrue interest at the lesser of (i) the annual rate of ten percent (10%), or (ii) the maximum interest rate permitted under applicable Law.

4. **CUSTOMERS RESPONSIBILITIES**

4.01  4.02 Regulatory/Governmental Authorities. Customer shall promptly (but in no event more than forty-eight (48) hours after notification or receipt) inform Manufacturer of any notification from FDA or any other Governmental Authority, which (i) raises any material concerns regarding the safety of any Product, (ii) indicates or suggests a potential material liability for either Party to third parties arising in connection with any Product, or (iii) is reasonably likely to lead to a recall or market withdrawal of any Product.

4.03    Laboratory Regulatory Authorities. It is the Customer's duty to comply with laboratory governing authorities such as CLIA and state regularity entities to ensure safe usage of the manufacturer's Products.

4.04    Warning Letters/Governmental Investigations. Customer shall promptly notify Manufacturer of any of the following, including any corrective actions initiated by customer, and provide Manufacturer with copies of all relevant documentation relating thereto, to the extent controlled by customer: (i) receipt of a warning letter relating to any Product; or (ii) an initiation of any Governmental Authority investigation, detention, seizure or injunction concerning any Product.

## 5.    REGULATORY APPROVAL; AUDIT; RECALLS

5.01    Regulatory Approvals. Manufacturer shall provide customer any filings required by applicable Governmental Authorities to permit customer to use the Products in the Territory, including, but not limited to, certificates of analysis and packaging lists for shipments. Customer is informed that all Products of manufacturer AID are not FDA approved. Customer may use the Products for research or any other lawful purposes. Customer is responsible for all regulatory responsibilities necessary to use the Products for clinical purposes.

An FDA approval for Manufacturer's Products is considered and projected for the future, and Customer will be informed by the Manufacturer as soon the proceedings allow in regards to progress in said FDA approval, so he can act appropriately

## 6.    TERMS

6.01    Term. The initial term of this Agreement shall begin on the Effective Date and, unless earlier terminated as set forth herein, shall continue for a period of 5years therefrom (the "Initial Term"). Provided that Customer has performed all of its obligations under this Agreement and has not been in material breach of any terms or conditions of this Agreement, the Initial Term may be extended for additional 5 year periods, subject to the Parties' agreement on commercial terms including, but not limited to pricing, minimum purchase orders and minimum purchase commitment (each such 5 year period referred to herein as a "Renewal Term" and together with the Initial Term referred to as the "Term"). Customer shall commence good faith efforts to negotiate the Renewal Term with Manufacturer six (6) months prior to the expiration of the Initial Term. In the event of a failure by the customer to commence good faith efforts to negotiate the Renewal Term, the Agreement shall terminate.

## 7.    REPRESENTATIONS, WARRANTIES AND COVENANTS

7.01 Mutual Representations and Warranties.

(a) Organization; Authority. Each Party is duly organized and validly existing in good standing under the laws of their jurisdiction of incorporation. Each Party has the power to execute, deliver and perform this Agreement.

(b) Binding Obligation. The execution and delivery of this Agreement by each Party does not, and the performance of its obligations hereunder will not, violate any provision

of the articles of incorporation or by-laws of such Party. This Agreement is a valid and binding agreement of each Party enforceable against it in accordance with its terms.

(c) No Other Agreement. Neither Party is a party to any agreement with or obligation to any third party or any other legally binding commitment of any kind or nature whatsoever that may conflict with, diminish or limit in any manner the full right and authority of such Party to perform its covenants under this Agreement.

(d) No Approval. No approval of any person, entity or Government Authority is necessary with respect to the execution, delivery and performance by each Party of this Agreement.

7.02    Representations and Warranties of Manufacturer.

(a) Non-infringement. As of the Effective Date hereof, the manufacture and supply of the Products by Manufacturer hereunder and the use by customer and for its intended purposes does not, infringe any intellectual property rights of third parties.

(b) Compliance. Manufacturer has complied with, and is complying with, and will comply with its duty of disclosure before all applicable Governmental Authorities, as defined by applicable Laws, including, but not limited to, 21 C.F.R. Parts 11, DIN EN ISO 13485:2016, in connection with the Products.

(c) Product Warranty. Manufacturer shall manufacture the Products in compliance with applicable Laws, including but not limited to, all current good manufacturing practices or equivalent standards, including the DIN EN ISO 13485:2016 applicable to manufacturing of the Products during the Term of the Agreement. Upon delivery to customer, Manufacturer shall ensure that the Products is not misbranded or adulterated under the Act, and is free from any material defects in materials and workmanship.

7.03   Limitation of Liability. IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES, INCLUDING LOST PROFITS, SUSTAINED OR INCURRED BY THE OTHER PARTY IN CONNECTION WITH THIS AGREEMENT, REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY) OR OTHERWISE, AND WHETHER OR NOT SUCH DAMAGES WERE FORESEEN OR UNFORESEEN EXCEPT TO THE EXTENT THAT CUSTOMER HAS BECOME LIABLE THEREFOR TO A THIRD PARTY AS A RESULT OF A BREACH BY MANUFACTURER.

**8.    GENERAL PROVISIONS**

8.01    Confidentiality. Both Parties acknowledge that, in the course of performing this Agreement, they may obtain or have access to Confidential Information of the other Party, and it is therefore required that certain steps be taken to ensure the protection of such Confidential Information. During the Term and for a period of five (5) years thereafter, both Parties will keep in strictest confidence and not reveal or disclose to any third party the existence, source, content and substance of all Confidential Information of the other Party; provided, however that any Confidential Information that constitutes a trade secret under applicable Law shall be subject to

the obligations of confidentiality set forth herein for as long as such Confidential Information retains its status as a trade secret. The Parties shall (i) take reasonable measures to ensure that no unauthorized use or disclosure is made by others to whom access to such Confidential Information is granted, (ii) use the Confidential Information solely as contemplated by this Agreement or to perform its obligations hereunder, and (iii) immediately notify the disclosing Party if the receiving Party learns or reasonably believes that any breach of the obligations of confidentiality contained herein has occurred. Nothing contained in this Agreement shall in any way restrict or impair a Party's right to use or disclose Confidential Information of the other Party which: a) at the time of disclosure, is generally available to the public, or, after the time of disclosure, becomes generally available to the public through no act of the Party; b) was in the Party's possession prior to the time of disclosure; c) was made available to the Party from a third party having the right to disclose such Confidential Information; or d) was independently developed by the Party. In the event the disclosure of Confidential Information is required by applicable Law, judicial or regulatory subpoena, the disclosing Party shall provide the other Party with prompt written notice of any such requirement in order to afford time either to seek an appropriate protective order (or other remedy) or a waiver of compliance therewith.

       8.02     Parties in Interest. This Agreement shall inure to the benefit of the Parties and their respective successors, heirs and permitted assigns. Nothing in this Agreement, expressed or implied, is intended to confer on any other person, other than the Parties or their respective successors, heirs and permitted assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement.

       8.03     Notices.   All notices and consents hereunder shall be in writing and shall be deemed to have been properly given and to be effective on the date of delivery if delivered in person, by one-day courier service or by facsimile transmission (provided a copy is sent by one-day courier service) to the respective address or facsimile number provided below or to such other address or facsimile number as either Party shall designate by written notice to the other in such manner:

If to Customer:

> Infectolab Americas LLC
> Attention: Dr. Felix Scholz
> Telephone No.: +1 612 275 0340
> Facsimile No.: + +1 651 305 6401

If to Manufacturer:

> Autoimmun Diagnostika GmbH
> Attention: Gerlinde Schöllhorn
> Telephone: +49 7434 9364 0
> Facsimile: +49 7434 9364 40

8.04	Independent Contractor. Each Party shall be and remain an independent contractor and not an employee or agent of the other and nothing herein shall be deemed to constitute a partnership between the Parties. Further, neither Party shall have any authority to act, or attempt to act, or represent itself, directly or by implication, as an agent of the other or in any manner assume or create, or attempt to assume or create, any obligation on behalf of or in the name of the other, nor shall either be deemed the agent of the other.

8.05	Waiver of Default. The failure of either Party to exercise any of the provisions of this Agreement shall not be construed as a waiver of such provisions, at any future time, during the Term.

8.06	Force Majeure. Neither Party shall be liable for a delay in the performance of its obligations and responsibilities under this Agreement due to causes beyond its control, including, but not limited to wars, strikes and lockouts, embargos, national emergencies, insurrection or riot, shortages of raw materials and energy, fire, flood or other natural disasters; provided that the affected Party has promptly informed the other Party indicating the presumable duration and extent of such impediment; provided, further, that if such impediment subsists for more than three (3) months, either Party shall be entitled to terminate this Agreement upon thirty (30) days written notice.

8.07	Captions. The captions to this Agreement are for convenience only, and are to be of no force or effect in construing or interpreting any of the provisions of this Agreement.

8.08	Governing Law. The validity, construction, and interpretation of this Agreement and any determination of the performance that this Agreement requires shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflict of law principles.

8.09	Severability. If any provision of this Agreement shall be held to be illegal, invalid or unenforceable by a court or authority of competent jurisdiction, the Parties shall endeavor to replace it by another provision that will as closely as possible reflect their original intention. The validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

8.10	Entire Agreement; Amendment. This Agreement and the Schedules hereto constitute the entire agreement between Customer and Manufacturer with respect to the subject matter hereof. All other agreements, representations, statements, negotiations and undertakings prior to the Effective Date, whether oral or written, are superseded hereby. No modification of this Agreement shall be binding on either Party unless it is in writing and signed by both Parties.

8.11	WHEREAS the customer has been the exclusive customer of the Manufacturer's Products (as such terms are defined below) since 13th of June 2018

IN WITNESS WHEREOF, the parties hereto have hereunto signed this Agreement as of the Effective Date set forth above.

AUTOIMMUN DIAGNOSTIKA GmbH

By: _____

Name: Gerlinde Scholhorn

Title: CEO AiD GmbH

INFECTOLAB AMERICAS LLC

By: _____

Name: Dr. Carsten Nicolaus

Title: CEO Infectolab Americas LLC

# SCHEDULE A

*PRODUCT LIST AND DESCRIPTION*

| Article number | Description |
|---|---|
| ELSP5000 | Basis-Kit IFN gamma |
| ELSP5500 | Basis Kit Riegel |
| ELSP5710 | iSpot-Kit IFN gamma+IL2 |
| ELSP5810 | iSpot-Kit Riegel IFN gamma+IL2 |
| ELSP5904 | Pokeweed |
| ELSP5905 | Borrelia B31 Lysat 1,5 ml |
| ELSP5909 | EBV Lysat 1,5ml |
| ELSP5910 | CMV Lysat 1,5 ml |
| ELSP5922 | Chlamydia trachomatis Lysat 1,5ml |
| ELSP5923 | Chlamydia pneumoiae Lysat 1,5 ml |
| ELSP5941 | LFA-1 Peptid-Mix 1,5 ml |
| ELSP5946 | Borrelia OSP Mix 1,5ml |
| ELSP5949 | Yersinien YOP's 1,5 ml |
| ELSP5958 | Borrelia myomotoi 1,5 ml |
| ELSP5962 | Mykoplasma pneumoniae 1,5ml |
| ELSP5963 | Babesia microti 1,5ml |
| ELSP5964 | Bartonella henselae 1,5ml |
| ELSP5981 | Ehrlichia Proteine 1,5 ml |
| ELSP 5966 | Rickettsia |
| ELSP5938 | EBV Lytic mix |
| ELSP5939 | EBV latent mix |
| ELSP5943 | CMV IE1 |
| ELSP5940 | CMV pp65 |
| ELSP5965 | Varizella Zoster |
| ELSP5915 | Candida albicans |
| ELSP5916 | HSV-1 |
| ELSP5917 | HSV-2 |
| ELSP5950 | Aspergillus Mix 1 |
| ELSP5951 | Aspergillus Mix 2 |

9